# COMMON PLEAS OF LACKAWANNA CO.

### EUGENE SNYDER vs. I. C DEPEW et al.

#### Writ of Estrepement—Waste.

1.  When a writ of estrepement has been issued upon an affidavit charging acts which are not waste it will upon motion be dissolved.
2.  The cutting of grass, and the harvesting of grain and other annual crops is not waste.

The plaintiff in this case brought an action of ejectment against the defendants, and obtained an award of arbitrators for the land described in the writ. Upon cause being shown a rule was granted by the Court to set aside the award. Pending this rule the plaintiff made affidavit that one of the defendants was committing waste upon the premises by cutting the grass and harvesting crops, and upon filing this, with a præcipe for a writ of estrepement to the same number and term as the action of ejectment, the Prothonotary issued the writ.

Upon motion by defendants the Court dissolved this writ.

*L. Amerman,* for motion.

The writ of estrepement in this case should be dissolved.

1. The action of waste is a separate and distinct action; the writ in this case is issued in an action of ejectment, and should be dissolved.

1. Purdon 55, pl 1.

2. The affidavit upon which the writ issued does not charge the commission of any act amounting to waste.

(*a*). Waste is a spoil or destruction in houses, gardens, trees or other corporeal hereditaments to the disherison of him that hath the remainder or reversion in fee simple or fee tail.

Coke Lit. 53.

(*b*). Whatever does a lasting damage to the freehold or inheritance is waste.

4 Co. 64.

(*c*). The tenant, notwithstanding this writ (estrepement), may cut down corn, grass or underwood.

Roscoe's Actions relating to real property 125, and cases cited.

(*d*). Quarrying and mining, and all such other acts as will do *lasting* injury, shall be considered waste.

Act of Assembly 1832.

2 Purdon 1465, pl. 2.

3. The writ could not issue, if otherwise regular, without the plaintiff first giving bond.

2 Purdon 1467, pl. 11, 12.

*E. B. Sturges, C. R. Pitcher*, contra.

1. The cutting of crops is waste.

Hoskinson vs. Bradford. 1 Pitts. 165.

2. The removing of grass tends to impoverish the soil, and is therefore waste.

Lewis vs. Jones, 17 Pa. St. R. 262.

Jones vs. Whitehead, 1 Pars. 304.

3. The plaintiff is not required to give bond.

Act 2 April, 1863.

2 Purdon 1467, pl. 12.

Opinion by HANDLEY, P. J.    12 July, 1879.

The plaintiff commenced his action of ejectment against the defendant, and obtained judgment for the land described in the writ, before the arbitrators, on the 10th of May, 1879. An affidavit was presented in term time to Judge Hand, setting forth the non-residence of one of the defendants, and that he never employed any counsel to appear for him; that the service of the second rule in the case was not served as required by law, whereupon rule was granted to show cause why the award should not be set aside. That rule is still pending. Subsequent to all this the plaintiff commenced his estrepement action to the same number and term as that of the ejectment. The tenant in possession now moves that the estrepement be dissolved, and to sustain his motion files an affidavit, setting forth that he is the agent and tenant of the defendant, I. C. Depew; that an action of ejectment to compel specific performance of a contract for the sale and conveyance of land was commenced by the plaintiff; that there is nothing due the said plaintiff on this land; that the plaintiff has filed no bond as required by law; that the petitioner will suffer great damages unless the estrepement be dissolved; that his crops are liable to perish and become worthless if not gathered and harvested at once. The only question we

are called upon to examine in this case is, whether the
tenant in possession may harvest his crops?    The statutory
definition of waste in Pennsylvania is, that quarrying  and
mining, and all such other acts as will do lasting injury to
the premises, shall be considered waste.    2 Purd. Dig.
1465, pl. 2.    What shall be deemed waste may be found,
according to common law, in 10 Bacon's Abr. 422.    The
tenant, notwithstanding the writ of estrepement, may  cut
down corn, grass or underwood.    Roscoe's Actions 125,
and cases cited.    The cutting of an annual crop is not
within the meaning of our statute, lasting waste or injury.
It is nothing but square justice that he who sows should reap.

Motion allowed, and estrepement dissolved.

## NOTES OF RECENT DECISIONS IN SUPREME COURT OF PENNSYLVANIA.

The assignment of the stock of a corporation to itself as
collateral security for a loan, divests the title of the as-
signor so far as to prevent a sale of it under a fi. fa. against
the assignor.

A shareholder in a building association, who has as-
signed his stock as collateral security for a loan, which is
also secured by a judgment against him, may elect, upon
a sheriff's sale of his real estate, to have the actual value
of his stock deducted from the amount of the judgment
before the latter is allowed to participate in the fund aris-
ing from the sale.

An attachment of the stock, after such an election, binds
nothing but the defendant's interest, if any remains after
the stock has been applied to the payment of the judg-
ment.—*Ewlg and Lane's Appeal.*

In an action by landlord against tenant for rent, the
tenant, in his affidavit of defence, averred removal  before

the end of his term, surrender of the lease and entry by the landlord, who made such repairs as could not have been made while the tenant was in possession, but did not allege acceptance by the landlord of the surrender:

*Held* (affirming the judgment of the Court below), that taking possession, repairing, and advertising the house to rent were all acts in the interest and for the benefit of the tenant, and did not discharge him from his covenant to pay rent.—*Bruechmann v*. *Twibill.*

---

Trustees in domestic attachment are not mere ministerial officers but are clothed with extraordinary discretionary powers.

McCready vs. The Guardians of the Poor (9 S. & R. 94) explained.

It is well settled that trustees who have acted in good faith, and under the advice of counsel, are not responsible for an error of judgment or a mistake of law.

A domestic attachment was issued against S. & Co. and was placed in the sheriff's hands at 2.10 P. M.; a fieri facias was issued against S. by an individual creditor and placed in the sheriff's hands at 3 P. M.; proceedings were begun to test the ownership by means of sheriff's interpleader; the trustees in the attachment were advised, however, by their counsel that there was grave doubt whether the attachment had not been improvidently issued, and under his advice effected a compromise with the execution creditor whereby certain items of property were released by each in favor of the other:

*Held,* that although the property was *in gremio legis* at the time the fi. fa. issued, and the levy thereunder was therefore void, yet the trustees had ample discretion to make the compromise, and inasmuch as they had acted in good faith and under the advice of counsel, they could not be surcharged.—*Bradley's Appeal.*

## EMPLOYEES' EXCUSES.

In Leopold vs. Salkey, the Supreme Court of Illinois passed on the effect of a clerk's absence from service, caused by his being arrested and imprisoned two weeks without his fault. He was under contract to serve for three years. This incident occurred early in the term,and in the busy season, so that the employer was compelled to engage another person. The action in which the question was raised was the clerk's action for damages in not continuing him in employ after his release, and after they had paid him all the compensation up to the end of his actual service. He recovered on the trial $500,the amount of two months' salary. The appellate court held he was entitled to nothing, and reversed the judgment.

This question presents a branch of a larger one which has exercised the wits of the bar and judges both in this country and in England. Fixed contracts for personal services are ordinarily peculiar in this, that while the service is long the periods for payment are usually short and numerous, and temporary inability and excuses of questionable efficacy are frequent. Hence the principles which suffice to settle actions for breach of other executory contracts, such as contracts for sale of goods, often prove inadequate to determine these cases.

The strong cases in favor of the servant are, in England, Hochster vs. De La Tour, 2 El. & B., 678, and K. vs. Raschen, 38 L. T., N. S., 38; and in Howard vs. Daly, 61 N. Y., 362, where, in a vigorous and able opinion,Prof. Dwight led the commission of appeals far toward the doctrine contended for, but not sanctioned in the common pleas of New York Moody vs. Leverich and Polk vs. Daily, 14 Abb. P., N. S.

The reasoning of the court on the Illinois case (8 Cent. L. J., 373) may be well indicated in these brief extracts. The appellee has averred in his declaration, ability, readiness and offers to perform, and his undertaking being an

entire one, it was incumbent on him to make the averment and support it by proof. (Badgley vs. Heald, 4 Gilm., 64; Swanzey vs. Moore, 22 Ill., 63.) Inasmuch, however, as appellants covenanted to pay for the services monthly, there could, doubtless, have been a recovery on the contract for services rendered for the month of December, 1874, after the expiration of that month, without any allegation further than that of performance of the contract by appellee during that time, but since that has been paid, and the appellee seeks a recovery only for a breach of contract arising from his not being allowed to perform his part of the contract during the subsequent month, he is bound to aver and show readiness, ability and offers to perform the contract as to the subsequent time. This is held to be the rule in Cunningham vs. Morsell, 10 Johns., 203, where Kent, C. J., carefully examines the authorities, and the Court overrules its previous decisions in Scars vs. Fowler and Havens vs. Bush, 2 Johns., 272, 387. This is approved in Thompkins vs. Elliot, 5 Wend., 496; Bean vs. Atwater, 4 Conn., 3, and McClure vs. Rush, 9 Dana, 64.

It may be conceded that the appellee was put in jail without his fault, yet this would not relieve him of his covenant to give his whole time, attention and skill to appellant's business. It is not claimed to have been through appellant's fault that he was put in jail, and there is no reason, therefore, why appellant's business should suffer in consequence of it. He might have guarded against this by an exception in his covenant, but he did not do so. The rule is, it is a good defence to an action on a covenant in a contract that the obligation to perform the act required was dependent upon some other thing, which the other party was to do and has failed to do. And the defence is good, although the omission of the other party to do the thing required of him was produced by causes which he could neither foresee nor control. 2 Parsons on Contracts, 6th ed., 674; Chitty on Contracts, 11th Am. ed., 1086.

There is a class of cases where a party contracting to

render personal services after part performance becomes
disabled by inevitable casualty, and is thereby prevented
from fully completing his contract, has been held entitled
to recover for the services actually rendered upon a *quan-
tum meruit.* Fenton vs. Clark, 1 Vt., 557; Hubbard vs.
Belden, 27 Vt., 645; Dickey vs. Linscott, 20 Me., 453;
Wolfe vs. Howes, 20 N. Y. 197. But these furnish no
warrant for the position that the labor can, in such cases,
recover upon the contract for a failure to pay for future
services which he has been prevented from performing.
On the contrary, they proceed upon the theory that the
contract is discharged by the inevitable casualty, and
therefore allow the party to recover simply for what he
has earned. Another class of cases may be found where a
party attempting to rescind a contract on account of the
default of the opposite party is held precluded by his
acceptance of the property, labor, etc., of the opposite
party.

But such cases can have no application here. In those
cases it is required that it shall be in the power of the
party to abandon the material ro product of labor received
and rescind the contract in toto, without an abandonment
of his own property. And his failure to thus abandon
them is construed as an acceptance of performance. See
Eldridge vs. Rowe, 2 Gilm., 91. When neither party is
at fault, the absence of the servent from the master or em-
ployer, without his consent, by whatever cause occasioned,
for an unreasonable length of time, we are of opinion, au-
thorizes the master to treat the contract as abandoned; and
what, in such case, is an unreasonable length of time, de-
pends upon the nature of the necessities of the business in
which the servant is employed.

---

The inhabitants of Georgia must be peculiarly athletic,
possibly descended from the warriors of the Trojan siege,
for we find several of them indicted for throwing "rocks."
The case, however, disappoints us, for it appears that wit-
nesses were not certain whether the missiles were "rocks
or brickbats." *Plain vs. State*, 60 Ga. 284.

## *THE LONGEST LAWSUIT.*

This is related to have been the famous "Berkley suit," which lasted upwards of 190 years, having commenced shortly after the death of Thomas, fourth Lord Berkley, in the reign of Henry V., (1416), and terminated in the seventh of James I., (1609). It arose out of the marriage of Elizabeth, only daughter and heiress of the above baron, with Richard Beauchamp, Earl of Warwick,—their descendants having continually sought to get possession of the castle and lordship of Berkley, which not only occasioned the famous lawsuit in question, but was often attended with the most violent quarrels on both sides, at least during the first fifty years or more. In the year 1469, (tenth of Edward IV.), Thomas Talbot, second Viscount Lisle, great grandson of the above Elizabeth, residing at Wotton-under-Edge, was killed at Nibleygreen, in a furious skirmish between some 500 of his own retainers, and about as many of those of William, (then) Lord Berkley, (whom he had challenged to the field), who likewise headed his men; when, besides the brave but ill-fated young Lisle, (scarcely at age at that time), about 150 of their followers were slain, and 300 wounded, chiefly of the Wotton party, who fled on the fall of their leader. Lord Lisle's sisters were his heirs, and their husbands (one of whom also got the title) followed up the suit, as their descendants did after them, till down to the time of the first James, when Henry, eleventh Lord Berkley, obtained a decree in favor of his claims, and got full and quiet possession of the lands and manors in dispute.

In *Marshall vs. The State*, 59 Ga. 154, the court say: "A man who can voluntarily shoot is capable of malice, unless he can plead some infirmity beside drunkenness. To be too drunk to form the intent to kill, he must be too drunk to form the intent to shoot." Which is good practical doctrine, even if liable to criticism in logic and metaphysics.

# COMMON PLEAS OF LACKAWANNA CO.

**BRUCE & COOK vs. MALONEY M'F'G. AND GAS COMPANY, LIMITED**

RULE TO SHOW CAUSE WHY EXECUTION SHALL NOT ISSUE AGAINST THE MEMBERS OF THIS ASSOCIATION INDIVIDUALLY.

The schedule called for under the Act of 1876, when a limited partnership association is formed must be strictly in conformity with the Act of Assembly, otherwise each member will be treated as if he was a general partner and liable for the whole liabilities of the concern.

Opinion by HANDLEY, P. J.

This association was organized under the Act of 1874. The depositions to sustain the rule show that the company was organized on the first day of October, 1877, and continued doing business until the tenth day of July, 1878. The company had no stock ledger, and there were virtually no cash payments for stock subscriptions. Mr. Maloney owned a stock of goods amounting to $12,500, also certain contract rights and privileges valued at $2,500. This constituted the stock of the corporation. At the closing of the business of the concern, the company sold out the stock of goods for the sum of $5,339.35. That the indebtedness of the company at the time of the sale was about $5,000.00. Up to the present none of the stock subscriptions were paid in in cash.

Attached to the depositions is a copy of the articles of association. Among other things appearing in this agreement, is the following, namely: "The total amount of capital is fifteen thousand dollars, which said amount of capital has been fully paid in by the assets and property of Martin Maloney at a valuation which has been approved by all the members subscribing to the stock of said association. A description of which property and the said valuation, and the name of the parties so contributing are as follows: Contract with the Pennsylvania Globe Gaslight Co. at a valuation of $2,500.00; merchandise consisting of

iron, steel, tin, and copperware, gas pipes and gas fixtures, plumbing materials, stoves, furnaces, pumps, terra cotta pipes, lamps and lamp posts, safe, store furniture and fixtures, all the goods, tools and chattels now on the premises 209 Lackawanna Avenue, valued at $12,500." The same article also provided that the association was to continue for twenty years.

. Now the first section of the act of 1874, P. L. 1874 p. 271, provides that when three or more persons may desire to form a partnership association for the purpose of conducting any lawful business within this state, "they may do so by subscribing and contributing capital thereto, which capital shall alone be liable for the debts of such association." This section also provides, that the statement in writing establishing such association, shall contain a statement showing "the total amount of capital, and when and how to be paid."

The supplement of 1876 allows the partners, "to make contributions to the capital thereof in real and personal estate, monies or other property, at a valuation to be approved by all the members subscribing to the capital of such association; *Provide*, That in the statement required to be recorded by the first section of the said act, subscriptions to the capital, whether in cash or in property, shall be certified in this respect according to the fact; and when property has been contributed as part of the capital, a schedule containing the names of the parties so contributing with a description and valuation of the property so contributed shall be inserted. P. L. 1876, 89, section 1.

Neither the supplement of 1875, nor the supplement of 1879, has any bearing upon the question involved in this case. No such schedule, as the act of 1876 contemplates, was filed by the members of this association, and hence under the rule adopted in this case of Bennet vs. Impact Brick Co. "Limited," 5 W. N. 58, these parties have not complied with the law.

No prudent business man ought to enter an association formed under the limited partnership law. It is much

more honorable when a person desires to enter into partnership, to enter into a general partnership, and thus assume, knowingly, all the duties and responsibilities of such a partnership.

If, however, a man desires at some future day to witness his property swept away, then let him enter into a limited partnership concern. He will soon discover that building associations with all their faults are not to be compared to such concerns. Perhaps at some future day when the act of 1874, and the several supplements thereto are more fully understood, business men may with safety invest their money therein.

In the present case, we have connected with this association some of our best business men, and we have no hesitation in saying that they did not know at the time they entered this association the liability the law cast upon them, the moment the articles of association were executed. When it is understood that man cannot limit man in his actions, then there will be more caution exhibited by men who desire to undertake that impossible thing.

The rule in this case, under the present showing, will have to be made absolute, and execution allowed as prayed for.

Rule absolute.

When the court cannot recall the title of a case they sometimes have an amusing way of identifying it, as for example, in Western R. R. vs. Thornton, 60 Ga. 300: 'Like the case of the pair of boots from Americus, I think that the the maximum '*de minimis non curat lex*,' should turn the scale against such persistent battles over little things in cases of doubt, if I entertained any.''

*NOTES OF RECENT DECISIONS IN SUPREME
COURT OF PENNSYLVANIA.*

---

A solicitor employed to draw the papers in relation to a loan of money on mortgage, cannot delegate his authority to obtain searches against the property so far as to bind his principal by his agent's knowledge of the omission of material facts in a search.

A., employed as solicitor by a building and loan association to prepare the papers for a loan upon a mortgage, in order to hasten the settlement employed B.,the mortgagor, to order and obtain the mortgage search from the Recorder's office. B., who was aware of the existence of a prior unsatisfied mortgage, requested the Recorder's deputy to omit it on the search, stating that he intended to pay it off with the money about to be loaned; and it was omitted. In an action for damages by the association against the Recorder for the loss occasioned by such omission:

*Held*, (reversing the judgment of the Court below), that the association was not bound by B.'s knowlege in the premises, and that the Recorder was liable.—*Peabody Building Association vs. Houseman.*

---

The Act of 4 April, 1877, allowing an appeal from the refusal to open a judgment entered by warrant of attorney or confessed by note, does not apply where the judgment so entered is afterwards revived by agreement of the parties.

A judgment of revival entered by agreement of the parties, upon an amicable scire facias, is not a judgment entered by virtue of a warrant of attorney, and no appeal lies from the refusal of a Court to open such a judgment.

Walter vs. Breisch, 5 WEEKLY NOTES, 358, distinguished.—*Lamb's Appeal.*

# AN INDORSER'S LIABILITIES.

THE DANGERS OF BECOMING SECURITY FOR A MARRIED
WOMAN.

Judge Hanna on the 30th of July, 1879, filed in the Or-
phans' Court his adjudication of the estate of the late Adam
M. Simpson. His Honor disallowed the claim of Mrs.
Lillie Branson, to recover the sum of $5,000 deposited with
the decedent on July 12,1878, for investment, on the ground
that no evidence in support of the claim was adduced.
The claim of P. P. Gustine, to recover the amount of two
promissory notes for a total of $349, made and signed by
Maggie A. Fiegel, and indorsed by the decedent, was al-
lowed.   The evidence showed that Mrs. Fiegel had re-
quested Gustine to sell her some furniture upon credit, but
that he had declined, upon the ground that she was a
married woman.   He, however, agreed to make the sale if
she would bring him the indorsement of a responsible
party.   She, therefore, executed promissory notes and ob-
tained Simpson's indorsement.   But when the notes ma-
tured they went to protest.   In his decision Judge Hanna
remarked:

"It is needless to cite authorities in support of the prin-
ciple that a married woman cannot be held liable for the
payment of a promissory note or bond, or upon any other
contract entered into by her, unless it be for the purchase
of the necessaries, or the necessary alteration and improve-
ment of her separate estate.   She can take advantage of
her disability, under the plea of coverture, but no one can
plead this incapacity to contract but herself,and it is purely
a personal privilege.   (Hope Building Association vs.
Lance, 6 W. N. C., 219.)   While, therefore, it is clear
that Mrs. Fiegel, the maker of these promissory notes,
would not be liable therefor, and the plea of coverture
would bar any recovery thereon, yet we think that the
decedent, as indorser, is liable to the holder for value, and
it is immaterial that the maker was a married woman."

## LEGAL REPRESENTATIVES

In the strict and literal acceptation of the term "legal representatives," it means executors or administrators, though it is frequently used, even in statutes as well as wills, deeds, contracts, etc., in a broader and more liberal sense, and is held to embrace heirs, assignees, purchasers and grantees. In the construction of the term, therefore, it is held by the courts that the question of intention must be taken into consideration, and this is to be gathered from the concomitant circumstances, the relative position of the parties to be affected, and the existing state of affairs, as well as from the instrument itself.

In Delanny vs. Burnett, 4 Gilm., 464, and in Phelps vs. Smith, 15 Ill., 574, the Supreme Court of Illinois held, that the assignee or purchaser was the legal representatives; while in Warnecke vs. Lembea, 71 Ill., 91, it was held that, where the legal representative was authorized to advertise, sell and convey property, it did not authorize the administratrix to advertise, sell and convey property.

In the Land Department, and in the United States courts, it has been uniformly held, that the term "legal representatives," in certificates for land patents, means heirs, where there has been no transfer, and assignees or grantees, where there has been a transfer.

See Hogan vs. Page, 2 Wall., 607, and Carpenter vs. Russell, 19 Wall., 137.—*Law Reporter.*

---

*NOTES OF RECENT DECISIONS IN SUPREME COURT OF PENNSYLVANIA.*

---

A mutual insurance company is relieved from liability for loss occasioned by fire, after a voluntary surrender and acceptance of the policy, and payment of assessments then due. No formal cancellation of the same, or erasure of

the name of the insured from the books of the company is necessary, notwithstanding the by-laws provided that the liability of the members should continue until such cancellation and erasure should have been made.—*Farmer's Mutual Insurance Co. vs. Winger.*

There is no right of adoption of children at common law. It is based entirely upon the Acts of May 4, 1855, providing for adoption by decree of the Court of Common Pleas, and the Act of April 2, 1872, providing for adoption by deed. By deed of August 11, 1863, A. agreed to "adopt B. as his daughter;" in May, 1870, he died intestate: *Held*, that, as under the law as it stood in 1870 the deed of 1863 gave B. no right to share as a child in A.'s estate, the retrospective provisions of the Act of April 2, 1872, could not give her any such right, or divest the title to the estate which vested in A.'s children immediately on their father's death. In order to take a parol gift of land out of the Statute of Frauds, improvement incapable of pecuniary compensation must combine with possession by the donee.—*Ballard vs. Ward.*

A sheriff's sale made by virtue of a lien acquired after a conveyance by the debtor, vests in the purchaser the rights of creditors to attack the conveyance for fraud; liens attaching to the grantor's interest after the conveyance are payable out of the fund arising from such sheriff's sale; liens against the grantor's interest prior to the conveyance are not divested by the sale. Judgment was recovered against A., who afterwards acquired an equitable interest in certain lands. He, then, in December, 1876, caused the lands to be conveyed to B., for the purpose, it was alleged, of defrauding his creditors. Execution on the judgment issued in February, 1877, and the land was levied upon and sold by the sheriff as A.'s property. The

fund arising from the sale was claimed by the judgment creditor, and by the city for taxes assessed for 1877: *Held* (affirming the decree of the Court below), that the taxes were payable out of the fund. Vanarsdalen's App., 3 Weekly Notes, 463, followed.—*Dungan's Appeal.*

---

Where the consideration of a promissory note is a promise by the payees to abstain from prosecuting the son of the maker for forgery. the note is void. Fulton vs. Hood, 10 Casey, 365, explained.—*National Bank of Oxford vs. Kirk.*

---

The confirmation of an award of damages by a road jury for opening streets under the Act of April 1, 1864, is a final judgment, the liability of the city being absolutely fixed by the confirmation. The judgment is for the payment of money. The Court of Quarter Sessions, which from the earliest period in this State has had exclusive jurisdiction in all matters relating to the opening of streets and the assessment of damages, although it has no power to issue the prerogative writ of mandamus, has the right to issue an order to enforce a judgment standing on its records. This right is inherent in every Court, and must be presumed to exist in the absence of legislative inhibition. Legislation in regard to the opening of streets and assessment of damages in the city of Philadelphia reviewed by Paxson, J.—*In Re Sedgly Avenue.*

---

In the exercise of the police power the legislature may require railway companies to light such portions of their roads as are within a corporation.

# COMMON PLEAS OF LUZERNE COUNTY.

### THE RELIEF SAVING I UND ASSOCIATION v. LONGSHORE ET AL.

1. It is lawful for a building association to lend money to members, reserving the premium and receiving interest on the sum nominally loaned. All contrary decisions refer to unincorporated associations, and to those prior to the Act of 1859.
2. There is nothing either in the letter or the spirit of the law making it the duty of the association to inquire for what purpose the loans are obtained.
3. A surety for a borrowing member, though not himself a member of the association, is liable to the same extent as his principal.

Opinion by HAND, J., July 15, 1879.

This is a rule to show cause why the judgment in this case shall not be opened and defendants let into a defense. The allegations are—1. Usury. 2. That the corporation is bound to see that its money is loaned for building purposes. 3. That R. B. Fruit is simply a surety, not a member of the association; and that even if his principal is bound to fulfill the duties of a member, the surety is not. 4. That the stock of the association has matured.

This is an association chartered under the Act of April 12, 1859, "to enjoy all the privileges incident to corporations provided by the Act of Assembly, entitled 'An Act relating to corporations for mutual saving fund, loan, or building associations,'" approved as aforesaid, and its several supplements, the succession being limited to twenty years. Clarence S. Longshore, one of the defendants, was a member of the association, holding twenty shares of its stock. He borrowed of the association four thousand dollars at a premium of seventy-six dollars per share, which was deducted from his loan, and the balance paid to him. He made his regular payments on stock, interest upon his loan, initiation fee, and fines up to April or May, 1876, when he ceased paying, after which Richard B. Fruit, his surety, continued the payments up to December, 1877. At the time the loan was made Longshore gave the joint and several judgment note of himself and Fruit to the association, of which the following is a copy, to wit:

$400.00.          Hazleton, Pa. September 16, 1871.

On demand, we, or either of us, promise to pay the Relief Saving Fund Association, of Hazleton, Pennsylvania, the sum of four thousand dollars, with interest, payable on the third Saturday of each month. Value received. And we hereby confess judgment for the same without stay of execution, inquisition, or benefit of exemption laws: *Provided, however*, that said principal shall not be demanded until default shall have been made for six months in the payment of interest, and of the monthly contributions payable on twenty (20) shares of the capital stock of said association, as provided by the by-laws.

          (Signed)          C. S. Longshore.
                             R. B. Fruit.

The statement of the account with the association upon this transaction is as follows:

| | | |
|---|---:|---:|
| Amount of note or loan | | $4,000 00 |
| Entire amount of premium | $1,520 00 | |
| Amount received in cash | 2,480 00 | |
| | | $4,000 00 |

PAID INTO THE ASSOCIATION.

| | | |
|---|---:|---:|
| Initiation fee | $ 20 00 | |
| Total monthly payments on stock | 1,680 00 | |
| Total monthly payments of interest | 1,500 00 | |
| Fines | 2 50 | |
| | | $3,202 50 |

At a regular meeting in June, 1878, the defendants being six months in arrears, the stock was declared forfeited, and an execution was issued, which has been stayed by the court in the present rule. The secretary of the association testifies that the stock, upon the collection of this judgment, will be reinstated.

The question before us is, have the defendants by their testimony shown enough to warrant our opening this judgment. We take up their points in their order as stated above.

Rule discharged.

E. P. Kisner, Esq., for plaintiff.

John A. Gorman, Esq., for defendants.